UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLORADO

---

KARINA RUIZ ALVAREZ, KARLA
GONZALEZ VELEZ, GABRIELA
MOCTEZUMA CASTILLO, and AMELIA
COLON CHAIREZ, on their own behalf and
on behalf of those similarly situated,

        Plaintiffs,

   v.

TELLURIDE RESORT PARTNERS, LLC
d/b/a MADELINE HOTEL &
RESIDENCES, MOUNTAIN PREMIER
CLEANING SERVICES, LLC, and
ADRIANA SANTA ANA,               Civil Action No.: 1:23-cv-00354-JLK

        Defendants.

---

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## ON ISSUE OF JOINT EMPLOYMENT

### I.    INTRODUCTION

Defendant Telluride Resort Partners, LLC d/b/a Madeline Hotel & Residences ("Madeline

Hotel" or "Hotel") files this Reply to Plaintiffs' Response in Opposition to the Hotel's Motion for

Summary Judgment (ECF# 70). As set forth below, most of Plaintiffs' Additional Facts, even if

they were undisputed, are immaterial because they pertain to the Fourth Circuit's *Hall-Salinas* test

for joint employment. As of October 5, 2021, that test is no longer good law, because its regulatory

underpinnings have been rescinded and not replaced. Under the *Bonnette* factors, which remain

good law, the Madeline Hotel should prevail on summary judgment because the undisputed facts

show that the Hotel was not a joint employer of Plaintiff H-2B guestworkers.

## II.     RESPONSE CONCERNING ADDITIONAL FACTS

31. By 2021, the Madeline Hotel was the largest recipient of the H-2B workers Mountain Premier brought to the United States. In 2021 and 2022, the Madeline Hotel was the largest customer Mountain Premier had.

    **Denied.** The Madeline Hotel is without knowledge as to the truth of this statement and therefore denies the same.

32. Many of the H-2B workers Mountain Premier brought to the United States would only ever work at the Madeline during their stay with Mountain Premier. In some seasons it was about 80% of the H-2B workers Mountain Premier brought to the U.S. who worked only for the Madeline Hotel.

    **Denied.** The Madeline Hotel is without knowledge as to the truth of this statement and therefore denies the same.

33. The Madeline Hotel was "a huge part of the hours [Ms. Santa Ana] could make available to an H-2B worker."

    **Denied.** The Madeline Hotel is without knowledge as to the truth of this statement and therefore denies the same.

34. The Madeline Hotel directly employed cleaners who did the same job the H-2B workers did in the same locations and at the same time, working side by side.

    **Denied** that Hotel employees and H-2B guestworkers worked in the same locations and at the same time, working side-by-side, as each individual worked alone. Ortiz Guadarrama Dep. 30:3-7, attached hereto as Exhibit 1; Catano Pinedo Dep. 13:14-18, attached hereto as Exhibit 2; Moctezuma Castillo Dep. 22:24-23:3, attached hereto as Exhibit 3. **Admitted** that the Madeline Hotel had employees who did the same job as H-2B guestworkers.

35. The Madeline Hotel does not directly employ enough cleaning staff to meet the Hotel's cleaning needs.

    **Admitted.**

36. Daily cleaning is a fundamental part of the Madeline Hotel's business.

    **Admitted.**

37. The Madeline Hotel's direct employees and the H-2B workers appeared on the same weekly work schedules, created by the same individual through a common process.

   **Admitted.**

38. The Madeline Hotel's direct employees and the H-2B workers attended daily pre-shift work planning meetings together.

   **Admitted**.

39. The Madeline Hotel's direct employees and the H-2B workers received work assignments sent from the same individuals, which individuals were employees of the Madeline Hotel, through the same electronic tablet system.

   **Admitted.**

40. The Madeline Hotel's direct employees and the H-2B workers were supervised by the same individuals, which individuals were employees of the Madeline Hotel.

   **Denied.** All work is done unsupervised. Exhibit 1, Ortiz Guadarrama Dep. 30:3-7; Exhibit 2, Catano Pinedo Dep. 13:14-18; Exhibit 3, Moctezuma Castillo Dep. 22:24-23:3. **Admitted** only to the extent that these supervisors would inspect each room to make sure it was cleaned in a manner consistent with the Contractual Cleaning Standards for the appearance of rooms. *See* Fact 27.

41. The Madeline Hotel's direct employees and the H-2B workers shared the same supplies and work tools, which were provided by the Hotel Madeline.

   **Denied** that the Hotel's employees and the H-2B guestworkers had to share the same supplies and work tools. *See* Derviskadic Dep. 41:3-12 (ECF# 70-1). **Admitted** that the Hotel Madeline provided supplies and work tools to the Hotel's employees and to H-2B guestworkers.

42. Direct employees of the Madeline Hotel used the same key issuance and tracking system, controlled by Madeline Management, which gave the H-2B workers access to hotel work sites and supply rooms.

   **Admitted.**

43. The Madeline Hotel's direct employees and H-2B workers were subject to the same cleaning performance standards and received the same training.

   **Denied** that the Madeline Hotel's direct employees and the H-2B guestworkers received the same training generally. Derviskadic Dep. 54:17-55:4, 132:1-11 (ECF# 70-1). **Admitted** that the Madeline Hotel's direct employees and the H-2B guestworkers were

subject to the same cleaning performance standards and received the same training as pertains to those cleaning performance standards *only*.

44. Madeline Hotel staff assigned the same volume of cleaning work (as measured through the Madeline's "credits system") to direct employees and to H-2B workers.

   **Denied.** Each worker was assigned work to their individual capacity. *See* Derviskadic Dep. 135:25-136:9, 136:25-137:15 (ECF #70-1).

45. The Madeline Hotel's direct employees and H-2B workers were subject to the same speed and productivity expectations.

   **Admitted** to the extent that speed and productivity expectations were captured by the credits system. The Madeline Hotel did not have separate expectations for speed and productivity apart from that system. Derviskadic Dep. 136:25-137:15 (ECF# 70-1).

46. The Madeline Hotel's direct employees and H-2B workers were monitored by the same individuals, using the same electronic tablet system, which did not differentiate between Madeline Hotel and MPC employees.

   **Admitted.**

47. The Madeline Hotel's direct employees and H-2B workers were subject to the same rules for receiving extra bonus payments.

   **Denied.** Mountain Premier invoiced the Madeline Hotel for extra credit payments due to H-2B guestworkers; any payment that those guestworkers received for that extra credit work came from Mountain Premier. *See* ECF# 70-6, p. 5 (Hotel requesting to see extra credit payments on invoices from Mountain Premier). The Madeline Hotel paid its employees directly for extra credit work.

48. "The Madeline Hotel trained the H-2B workers Mountain Premier supplied to them, as to any work that would occur at the Madeline Hotel."

   **Denied**. Although the Madeline Hotel provided training to H-2B guestworkers as to the Hotel's standards, Mountain Premier also provided training to H-2B guestworkers. Derviskadic Dep. 54:17-55:4, 132:1-11 (ECF# 70-1).

49. Those Mountain Premier H-2Bs who worked only for the Madeline Hotel "were only trained by the Madeline. [Ms. Santa Ana] didn't train them at all."

   **Denied**. H-2B guestworkers acknowledged that they received training from their peers. Additionally, Ms. Santa Ana or her sister provided retraining to H-2B guestworkers. Exhibit 1, Ortiz Guadarrama Dep. 34:3-7; Exhibit 2, Catano Pinedo Dep. 34:8-20, 35:2-

36:2; Exhibit 3, Moctezuma Castillo Dep. 37:19-38:18; Barrientos Osnaya Dep. 24:5-16, 26:15-24, attached hereto as Exhibit 4.

50. Madeline Hotel staff provided training on Madeline-specific standards, expectations, and procedures to all H-2B workers in the alleged class. These H-2B workers shadowed Madeline supervisors and direct-employee cleaners to observe them and learn protocol. Madeline Hotel staff decided when those H-2B workers had demonstrated adequate progress to be assigned to clean on their own.

**Admitted.**

51. Madeline personnel trained the H-2B workers to work as room attendants, cleaning guest rooms.

**Denied**, except to the extent necessary to meet the Madeline Hotel's Contractual Cleaning Standards. Derviskadic Dep. 54:17-25, 55:5-14, 134:14-21 (ECF# 70-1).

52. Madeline personnel trained the H-2B workers to work at the hotel's spa.

**Denied**, except to the extent necessary to meet the Madeline Hotel's Contractual Cleaning Standards. *See* Fact 10.

53. Madeline personnel trained the H-2B workers to work in the hotel's gym.

**Denied**, except to the extent necessary to meet the Madeline Hotel's Contractual Cleaning Standards. *See* Fact 10.

54. Madeline Hotel supervisors could and did send the H-2B cleaners back to redo work they had performed if they found that work unsatisfactory.

**Denied**, except to the extent that redoing rooms was necessary to meet the Madeline Hotel's Contractual Cleaning Standards. Derviskadic Dep. 56:11-19 (ECF# 70-1).

55. "Mountain Premier did not make the shift schedule. Mountain Premier did not assign the hours to be worked at the Madeline. The Madeline Hotel did that."

**Admitted**, although the Madeline Hotel was unable to schedule H-2B guestworkers unless Mountain Premier said that they were available. Derviskadic Dep. 53:23-54:5, 113:20-24, 127:1-5 (ECF# 70-1).

56. Ms. Derviskadic established the work schedule. She determined how many hours and the days the Madeline Hotel needed, and she assigned those hours to particular H-2B workers.

**Admitted**, although Ms. Derviskadic was unable to schedule H-2B guestworkers unless Mountain Premier said that they were available. Derviskadic Dep. 53:23-54:5, 113:20-24, 127:1-5 (ECF# 70-1).

57. Ms. Derviskadic created a paper work schedule and posted it outside of her office every week during the relevant time period. The MPC workers learned of their work schedule through her print out.

   **Admitted.**

58. Ms. Derviskadic consulted no other person in making the schedule for the MPC workers. She consulted only expected guest arrival and departure data which dictated staffing levels. She did not consult Mountain Premier, nor the individual workers.

   **Denied.** For example, when scheduling overtime, Ms. Derviskadic or a supervisor would "go down the schedule and ask who was available to help, and then we would ask them to call the agency and get confirmation they can stay." Derviskadic Dep. 127:1-5 (ECF# 70-1).

59. Once posted, alterations to the individual MPC workers' schedules (adding or subtracting hours or shifts) were made only with the authorization of the Madeline Hotel management office.

   **Denied.** While Madeline Hotel management was involved in making alterations to the schedule, this process was done in consultation with the affected H-2B guestworkers and Mountain Premier. Derviskadic Dep. 127:1-5 (ECF# 70-1) (Ms. Derviskadic or a supervisor would "go down the schedule and ask who was available to help, and then we would ask them to call the agency and get confirmation they can stay.").

60. "If a Mountain Premier H-2B worker wanted time off from the schedule Vesna set, they would talk to [Ms. Derviskadic] directly."

   **Denied.** The H-2B guestworkers would make time off requests of Ms. Santa Ana, who would relay that information to Ms. Derviskadic.

61. Madeline Hotel staff had to approve any overtime hours the MPC workers worked at the Madeline Hotel.

   **Denied.** While the Hotel had to approve overtime hours, it was not alone in making such decisions. For example, when scheduling overtime, Ms. Derviskadic or a supervisor would "go down the schedule and ask who was available to help, and then we would ask them to call the agency and get confirmation they can stay." Derviskadic Dep. 127:1-5 (ECF# 70-1).

62. The Madeline's evening shift supervisors were authorized to add H-2B workers to the schedule, extending their work days and compensable hours, which ultimately appeared on Mountain Premier time cards used to pay their wages.

**Denied.** The Hotel's supervisors were authorized to add H-2B guestworkers to the schedule, but only in consultation with the workers and Mountain Premier. For example, when scheduling overtime, Ms. Derviskadic or a supervisor would "go down the schedule and ask who was available to help, and then we would ask them to call the agency and get confirmation they can stay." Derviskadic Dep. 127:1-5 (ECF# 70-1).

63. Adriana Santa Ana and MPC "did not determine what rest beaks [sic] the H-2B workers got at the Madeline Hotel. The Madeline made their own policy about that."

**Denied.** *See* ECF# 71-8, ¶ 7 ("The Madeline Hotel has a practice and policy of providing one ten-minute paid break per shift for every four hours worked, consistent with Colorado law. All Hotel employees are subject to this policy, and the Hotel *expects* the same for temporary contract workers, including the workers who provided services on behalf of Mountain Premier Cleaning Services, LLC.") (emphasis added).

64. The class members were provided with an unpaid 30-minute meal period.

**Admitted.**

65. Hotel policy was that the 8-hour day shift (8:00 AM-4:30 PM) received one additional ten-minute break per day, while the night shift, working only four hours (5:00-9:00 PM) did not qualify for a ten-minute rest break.

**Denied**. While Ms. Derviskadic did testify that this was the break practice for the housekeeping department, it is not the policy of the Madeline Hotel, which specifies that employees receive a paid ten-minute break for every four-hour period. ECF# 71-8, ¶ 7.

66. Madeline Hotel supervisors assigned specific work to specific MPC workers.

**Denied.** Coordinators for the Madeline Hotel made assignments through the ALICE system. Derviskadic Dep. 26:8-27:12, 28:6-14 (ECF# 70-1).

67. The Madeline Hotel assigned and tracked the work of all individual MPC cleaners through an electronic tablet system called ALICE. The Madeline Hotel distributed electronic tablets with the ALICE app on them to each cleaner daily and required the use of that tablet during the work day.

**Admitted.**

68. Madeline Hotel coordinators populated the ALICE system with assignments. Ms. Santa Ana and her company lacked any access to the ALICE system, which was controlled exclusively by Madeline Hotel staff.

**Admitted.**

69. The ALICE tablets identified each cleaner individually and Madeline Hotel coordinators used ALICE to assign particular rooms (or other cleaning work) to each particular cleaner.

**Admitted.**

70. The Madeline Hotel decided the volume of work that would be assigned to each MPC worker and gradually increased workloads to meet the workers' capacity.

**Admitted.**

71. Madeline Hotel staff used the ALICE system to tell each cleaner which room to clean first and which room to clean next.

**Denied.** Ms. Derviskadic testified only that the ALICE system can be used to give rooms a priority and that the system was "sometimes" used for that purpose. Derviskadic Dep. 28:9-21 (ECF# 70-1).

72. Using the ALICE system, Madeline Hotel staff tracked the time each room cleaning was initiated and concluded by each individual MPC worker.

**Admitted.**

73. Madeline Hotel coordinators watched the cleaners' progress on the ALICE app in real time. They could change work assigned to the individual H-2B worker in real time.

**Denied.** Ms. Derviskadic testified only that coordinators could see the progress of cleaning a room in real time through the ALICE app and could request that an assigned room take priority. Derviskadic Dep. 31:22-32:23 (ECF# 70-1).

74. The Madeline Hotel established and communicated an amount of time within which the MPC cleaners were expected to complete cleaning hotel rooms of particular sizes. Madeline Hotel staff monitored the cleaners' compliance with these time and productivity expectations using the ALICE system.

**Denied.** While the Madeline Hotel had general expectations for time spent cleaning a particular room, the actual time spent cleaning was flexible, depending on the condition of the room. Derviskadic Dep. 80:4-11 (ECF# 70-1) ("[W]e would also mention what would be the length of time to spend in a room. And I also mentioned it would be something different because some rooms require more time than the others based on conditions that you find when you go in, and we would honor that.").

75. The Madeline Hotel decided which cleaning supplies the H-2B workers were required to use.

**Admitted.**

76. The Madeline Hotel provided all cleaning supplies the H-2B workers used.

   **Admitted.**

77. The Madeline Hotel decided which tools ("sponges, brushes, mops, cleaning racks, toilet brushes…") the H-2B workers would use in their work. The Madeline Hotel provided those tools to the H-2B workers, who were not permitted to make a different choice or bring their own tools.

   **Admitted.**

78. The Madeline Hotel controlled access to the work site which the H-2B's [sic] worked. Mountain Premier did not. The Madeline gave the H-2B workers codes and keys to access work and supply areas.

   **Admitted.**

79. The Madeline Hotel was in charge of assigning work and checking and correcting the quality of the work the H-2B workers did at the Madeline Hotel. Ms. Santa Ana and Mountain Premier had no role in that.

   **Denied**. Although the Madeline Hotel assigned work and provided feedback to H-2B guestworkers, it specifically referred all disciplinary matters to Ms. Santa Ana and Mountain Premier. Derviskadic Dep. 55:7-14, 56:11-19, 61:11-21, 132:20-133:3 (ECF# 70-1).

80. Adriana Santa Ana was not regularly present at the Madeline Hotel. She did not supervise the MPC cleaners' work there.

   **Denied** that Ms. Santa Ana did not supervise the MPC cleaners' work, as she was responsible for disciplining H-2B guestworkers. *See* Fact 17. **Admitted** that she was not regularly present at the Madeline Hotel.

81. Mountain Premier did not have any supervisors at the Madeline Hotel at all.

   **Admitted.**

82. Supervisors employed by the Madeline Hotel reviewed the MPC workers' work and detected and addressed problems, providing feedback to the room attendants and housemen.

   **Denied.** Supervisors only reviewed the H-2B guestworkers' work as it related to the Contractual Cleaning Standards, including asking H-2B guestworkers to redo rooms that did not meet those standards. They did not supervise the H-2B guestworkers generally or otherwise address performance problems. Derviskadic Dep. 55:7-14, 56:11-19, 61:11-21, 132:20-133:3 (ECF# 70-1).

83. Managers and Assistant Managers employed by the Madeline Hotel also supervised the H-2B workers' work.

    **Denied.** Managers and Assistant Managers only reviewed the H-2B guestworkers' work as it related to the Contractual Cleaning Standards. Derviskadic Dep. 15:9-21 (ECF# 70-1). They did not supervise the H-2B guestworkers generally or otherwise address performance problems. *Id.* at 55:7-14, 56:11-19, 61:11-21, 132:20-133:3.

84. Adriana Santa Ana was "of course" unaware of which H-2B workers were assigned to which tasks and departments at the Madeline. Ms. Derviskadic emailed Ms. Santa Ana at times to inform her that MPC workers had changed tasks and departments at the Madeline Hotel.

    **Denied.** Ms. Derviskadic had an email exchange with Mountain Premier about one H-2B guestworker who appeared on invoices for housekeeping, and Ms. Derviskadic eventually "confirmed with [A]driana" that this listing was correct. ECF# 70-3, p. 2.

85. Mountain Premier adopted a punch clock timekeeping system because the Madeline told it to. At first, the H-2B workers had kept time using paper sheets. Mountain Premier changed the way it records its' H-2B workers' time worked for compensation purposes because the Madeline Hotel told it to do so.

    **Denied.** Ms. Derviskadic testified that the Madeline Hotel requested that Mountain Premier adopt a punch clock timekeeping system and Mountain Premier did so, but she did not speculate as to Mountain Premier's reasons. Derviskadic Dep. 75:15-76:4 (ECF# 70-1).

86. Ms. Derviskadic would receive and review the punch clock records of each individual H2B worker for accuracy, given her knowledge of their work scheduled and performed.

    **Denied.** This statement is unsupported by the cited testimony. Ms. Derviskadic testified that she compared the time sheets to the invoices to ensure that the invoices were accurate. She also testified that she compared the hours on the time sheets to the hours listed on the schedule. She did not testify as to having any other knowledge of the H-2B guestworkers' "work scheduled and performed." Derviskadic Dep. 100:7-102:24 (ECF# 70-1).

87. Ms. Derviskadic corresponded with Ms. Santa Ana to tell her which MPC H-2B workers had claimed to work more or fewer hours than they had actually worked.

    **Denied.** Ms. Derviskadic emailed Ms. Santa Ana to report discrepancies that she observed in the time sheets, comparing that information with the punch clock data that Ms. Santa Ana provided. This comparison is something that Ms. Santa Ana had the ability to do. *See* Derviskadic Dep. 100:10-16 (ECF# 70-1) ("Q: So [Ms. Santa Ana] would see the time sheets, but she doesn't know if people are doing wrong on the punch clock, right? A: She should know if she is looking at the time sheets, but her accountant was [probably] doing it, so I'm addressing to her, and then she will address to her accountant.").

88. Ms. Santa Ana herself was unaware of workers deviating from scheduled work hours because she was not regularly present at the hotel. Ms. Derviskadic had superior knowledge of the actual hours the H2B workers worked and would inform Ms. Santa Ana of necessary corrections to the MPC punch clock's record.

**Denied.** While Ms. Santa Ana did not personally observe all hours that H-2B guestworkers worked, she was or should have been aware of deviations from scheduled hours, as Hotel supervisors confirmed with her that workers were needed for overtime shifts, particularly since Ms. Santa Ana arranged for the H-2B guestworkers' transportation. Derviskadic Dep. 127:1-5 (ECF# 70-1); Chaverri Dep. 36:3-21 (ECF# 70-5); Exhibit 3, Moctezuma Castillo Dep. 15:25-16:5.

89. "[Ms. Derviskadic] would go through each worker's time cards to see whether she agreed with the work hours they claimed. She told [Ms. Santa Ana] how to adjust an H-2B worker's hours she considered to be inaccurate. If the Madeline told [Ms. Santa Ana] the hours recorded in the punch clock were wrong, the worker's pay would be adjusted to correspond to the work hours the Madeline told [her] were legitimate."

**Denied.** As noted above, Ms. Derviskadic made Ms. Santa Ana aware of discrepancies that Ms. Derviskadic found between the time sheets and the punch clock records, and this was information that Ms. Santa Ana also could have discovered by closely examining the records.

90. On some occasions, the Madeline Hotel would not release its check to pay MPC until Ms. Santa Ana cooperated with the Madeline's audit of the hours the H-2B workers reported having worked.

**Denied.** The Madeline Hotel reviewed hours listed in time sheets and compared them to scheduled hours and invoiced hours; it did not "audit" the hours that H-2B workers reported having worked. ECF# 70-6, p. 2-3.

91. Madeline Hotel staff assigned extra work tasks to particular H-2B workers (for example, making a roll away bed) and kept records of them, awarding specific quantities of extra credit wages to those workers, which Madeline personnel would then tell Adriana Santa Ana to pay that worker. Ms. Santa Ana did as she was told, and increased what she paid those H-2B workers the Madeline directed in specific amounts. Madeline personnel followed up with Ms. Santa Ana to assure that MPC had actually paid those extra credit wages to her H2B workers.

**Denied.** The Madeline Hotel kept records of extra credits that H-2B guestworkers earned for work performed and provided that information to Ms. Santa Ana so that Mountain Premier could invoice the Hotel for that work. While the Hotel asked Ms. Santa Ana if she had been paying H-2B guestworkers for that extra work, the context of the question was that the Hotel did not see the extra work being charged on the invoices that the Hotel received from Mountain Premier. ECF# 70-6, p. 5-6.

92. On some occasions, Madeline would not release its check to pay MPC until Ms. Santa Ana demonstrated that she had made the payment of extra pay bonuses Madeline had determined were due to individual H2B workers.

   **Denied.** The Madeline Hotel declined to release payment for invoices that were incomplete, including missing extra pay bonuses. *See* Derviskadic Dep. 87:16-88:4 (ECF# 70-1) (Derviskadic testifying about payments made to H-2B guestworkers: "We have no control of that."); ECF# 70-6, p. 10.

93. In addition, the Madeline Hotel paid those H2B workers who met the Madeline's expectations and worked the whole season at the Madeline a year-end gratuity. Ms. Derviskadic corresponded with Mountain Premier to tell them how much gratuity each H-2B worker should be paid.

   **Admitted.**

94. Ms. Derviskadic sometimes corresponded with Ms. Santa Ana to learn the dates on which Mountain Premier would deliver its pay checks to particular H-2B workers.

   **Denied.** The cited testimony refers to an email pertaining to the last paycheck for one H-2B guestworker.

95. Madeline staff had and exercised the power to suspend particular MPC workers from the Madeline Hotel, sending them away for retraining, when they failed to meet the Madeline's quality or productivity expectations.

   **Denied.** When the Madeline Hotel experienced problems with H-2B guestworkers, Ms. Derviskadic would request that Mountain Premier provide retraining to those workers. Derviskadic Dep. 60:25-61:3 (ECF# 70-1) ("[A]t first we would request retraining on cleaning processes, procedures. And if we would not see any improvement, we would say that we would not like to see them coming back."); 63:7-15 ("Q: When you say they were sent back for retraining, you would have them sent back, right? A: No. I would just address it, and I would be asked if I am willing to take them back after additional retraining, and I would always say, yes, I would agree to that. And when they come back and we see improvements, we would just leave them, sir, and they would stay to work for Madeline Hotel through the agency; through Ms. Adriana Santa Ana."). The Hotel did not unilaterally suspend H-2B guestworkers.

96. At times, the Madeline Hotel terminated MPC workers permanently. Madeline staff would sometimes tell MPC they did not want a particular H2B worker to return to the Madeline, and Ms. Santa Ana would not bring them back to work there.

   **Denied** that the Madeline Hotel unilaterally terminated H-2B guestworkers or that removal from the Madeline Hotel resulted in permanent termination from Mountain Premier. **Admitted** that Madeline staff would sometimes tell Mountain Premier that they did not

want a particular H-2B guestworker who did not show any improvement to return to the Hotel, and Ms. Santa Ana would not bring that worker back to the Hotel.

97. The Madeline Hotel denied those H-2B workers who were removed from the Madeline due to unsatisfactory performance receipt of the year-end gratuity the Madeline offered.

**Admitted.**

98. Madeline Hotel staff had and exercised the authority to deny those workers the Madeline assessed to be doing poor work the opportunity to earn extra pay credits.

**Admitted.**

99. Madeline Hotel staff monitored the performance of individual MPC cleaners and provided regular feedback to Adriana Santa Ana about which MPC workers were and were not performing well.

**Admitted.**

100.    The Madeline Hotel played a role in deciding how many H-2B workers MPC would bring to the United States and which ones they would be. The Madeline told Ms. Santa Ana how many workers they wanted and she would apply to the government for that number of H-2B visas.

**Denied**. Although the Madeline Hotel informed Ms. Santa Ana how many workers they wanted for a particular season, Ms. Santa Ana exercised her own business judgment to request the number of workers that would fulfill her contracts with the Madeline Hotel and other customers. *See* Fact 32 (claiming that 80% of Mountain Premier's H-2B guestworkers worked at the Madeline Hotel; the remaining 20% worked elsewhere). The Madeline Hotel did not instruct Ms. Santa Ana on which workers to select. ECF# 68-2, ¶ 8. Ms. Santa Ana's decision to bring back workers who performed well in prior seasons was an independent business judgment.

101.    Ms. Derviskadic would tell Ms. Santa Ana which workers she wanted to have back, returning to the Madeline to work the next season. Ms. Santa Ana would put those workers on the list for the visas she was awarded. The workers the Madeline did not tell her they wanted back were not put on the list to bring back for the next season.

**Denied.** The Madeline Hotel did not instruct Ms. Santa Ana on which workers to select. *Id*. Ms. Santa Ana's decision to bring back workers who performed well in prior seasons was an independent business judgment.

102.    During the COVID pandemic, Madeline Hotel staff ordered the H-2B workers to take COVID tests.

**Denied.** The Madeline Hotel did not mandate COVID tests for any vendors who worked on site at the Hotel, though it did suspend vendors who reported symptoms, in accordance with local health authority guidelines.

103.     When Mountain Premier's H-2B workers had been exposed to or contracted COVID it was Madeline Hotel management that suspended them from work for a given number of days.

**Admitted**, although the Madeline Hotel had the same policy for all vendors who worked on site at the Hotel. The length of time was proscribed by local health authority guidelines.

## III.    ARGUMENT

### A.  *Hall-Salinas* **Is Not the Appropriate Test Because It Is No Longer Good Law.**

Throughout their Response, Plaintiffs argue for application of the *Hall-Salinas* test. *See* ECF# 70, p. 20-28. This test, set out by the Fourth Circuit, is no longer good law – the regulation underlying the Court's ruling in *Salinas*, 29 C.F.R. § 791.2(a), was repealed effective October 5, 2021. 86 FR 40939 (July 30, 2021); 86 FR 52412 (Sept. 21, 2021). *See Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 133-4 (4th Cir. 2017) (citing the language of 29 C.F.R. § 791.2(a) to distinguish "separate and distinct employment," which exists when "all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the" individual's employment, and "joint employment," which exists when "the facts establish … that employment by one employer is not completely disassociated from employment by the other employer[ ]."").

In *Salinas*, the Fourth Circuit held:

Tests focusing on the relationship between a worker and a putative joint employer – like the *Bonnette* test – do not address, much less solve, the problem of whether two entities are "entirely independent" or "not completely disassociated" with regard to the essential terms and conditions that govern a worker's employment, 29 C.F.R. § 791.2(a), and thus whether the worker's employment with the two entities should be treated as "one employment" for purposes of determining compliance with the FLSA.

*Id.* at 137, citing *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006). The "not completely disassociated" test is pulled directly from the version of 29 C.F.R. § 791.2(a) that was repealed.

In the absence of this regulatory framework, the *Bonnette* test, which focuses on the relationship between the worker and the putative joint employer, has been recognized by this Court, and is still good law. The *Bonnette* test, therefore, should apply.

For the reasons stated above, the Court should decline to follow the Fourth Circuit's now-defunct approach in *Hall-Salinas*.[1] As such, facts concerning the relationship between Mountain Premier and the Madeline Hotel, though largely disputed, are immaterial to the issue of joint employment. *See*, *e.g.*, Response Concerning Additional Facts, ¶¶ 31-33, 78, 99-101.

**B. Application of the *Bonnette* Test Establishes that the Madeline Hotel Is Not a Joint Employer.**

Regarding the first *Bonnette* factor, Plaintiffs contend that the Madeline Hotel had the power to hire and fire H-2B guestworkers because the Hotel requested to remove workers from its contract who failed to show improvement after retraining, and based on that request, Ms. Santa Ana apparently decided not to put those workers on the list for visas to return the following season. ECF# 70, p. 24. That the Hotel asked to remove poorly performing workers from its contract is not tantamount to firing – Mountain Premier acknowledged that it had other customers whom it could have staffed with those H-2B guestworkers. *See* ECF# 70, p. 10, Additional Fact 32.

---

[1] Plaintiffs cite the Colorado Department of Labor and Employment Interpretive Notice & Formal Opinion, #10 for the proposition that *Salinas* is "the joint employer test applicable to Colorado wage laws," including Plaintiffs' claims under the Colorado Minimum Wage Act, the Colorado Overtime and Minimum Pay Standards Order, and the Colorado Wage Claim Act. *See* ECF# 70, p. 20, n.5. The Court should not rely on this non-binding authority, where there are no Colorado cases adopting *Salinas*, and *Salinas* is no longer good law, as explained above.

Mountain Premier's business decision not to seek renewed employment for workers that failed to support the company's contractual obligations cannot be imputed to create an employment relationship between the H-2B guestworkers and the Madeline Hotel.

Similarly, the fact that Ms. Santa Ana chose to bring back H-2B guestworkers that satisfied the company's contractual obligations is not equivalent to a hiring decision by the Madeline Hotel. It is undisputed that Mountain Premier recruited the H-2B guestworkers from Mexico, sponsored their employment in the United States, and retained their services pursuant to employment contracts. *See* ECF# 69-1, ¶¶ 5-6; Undisputed Facts 12-14. The Madeline Hotel had no role in that process and did not dictate which H-2B guestworkers would be selected to return in subsequent years. *See* Response Concerning Additional Facts, ¶ 101. This factor weighs firmly against joint employment.

Regarding the third *Bonnette* factor, Plaintiffs contend that the Madeline Hotel determined the rate and method of payment for the H-2B guestworkers because the Madeline Hotel reviewed Mountain Premier's time records for accuracy before paying invoices. The fact that the Hotel took it upon itself to make sure that it was being charged correctly by reviewing time records is not the same thing as determining what wage rate(s) the H-2B guestworkers should receive; it is simply ensuring that the Hotel paid for hours actually worked at the agreed-upon rate.

Plaintiffs mischaracterize this as "hav[ing] the direct effect of changing the hourly wages H-2B workers were paid." ECF# 70, p. 27. On the contrary – reviewing the time records for accuracy had the effect of making sure that H-2B guestworkers received the *same* hourly pay for all hours worked. In other words, H-2B guestworkers who worked more hours than reported on the punch clock records were not shorted by receiving less pay than they earned, and H-2B

guestworkers who worked fewer hours than reported on the punch clock records did not receive a windfall by receiving more pay than they earned. Mountain Premier and Ms. Santa Ana could have, and probably should have, undertaken this review themselves, but they apparently did not. *See* Response Concerning Additional Facts, ¶¶ 86-89. That fact does not transform the relationship between the H-2B guestworkers and the Madeline Hotel into that of a joint employer. This factor weighs firmly against joint employment.

Regarding the fourth *Bonnette* factor, Plaintiffs contend that the Madeline Hotel maintained employment records because it received punch clock records from Mountain Premier and created records of extra credits earned and gratuities due to H-2B guestworkers. While "*Bonnette* does not clearly specify what constitutes employment records," district courts in the Ninth Circuit (where *Bonnette* originated) have found that "records kept to determine how much work has been accomplished for the sake of determining pay to a subcontractor are not seen as employment records." *Montoya v. 3PD, Inc.*, No. 3:134-cv-08068, 2014 WL 3385116 at *7 (D. Ariz. July 10, 2014), citing *Adams v. U.S. Airways, Inc.*, No. CV 10-1088, 2013 WL 1345509 at *4 (D. Ariz. Mar. 29, 2013). These are precisely the type of records at issue here, and thus this factor weighs against a finding of joint employment.

District courts in the Ninth Circuit have also found that the term "employment records" should be narrowly construed to include "only the sorts of documents that are part-and-parcel of the traditional employment relationship, such as personnel files, time sheets, pay stubs, and government employment forms." *Castillo v. Spencer's Air Conditioning & Appliance Inc.*, No. CV-22-00798, 2024 WL 706939, at *17 (D. Ariz. Feb. 21, 2024), citing *Hugee v. SJC Grp., Inc.*, No. 13 Civ. 0423, 2013 WL 4399226, *7 (S.D.N.Y. Aug. 14, 2013) and *Franco v. Roman's*

*Commercial Cleaning & Property Maintenance, Inc.*, No. 16-225, 2018 WL 2447790, *5 (D.R.I. May 31, 2018). It is undisputed that the Madeline Hotel does not maintain these types of documents. *See* Facts 9, 13, 17, 18, 20, 22, 23. This factor weighs firmly against joint employment.

Regarding the second *Bonnette* factor, Plaintiffs contend that the Madeline Hotel's reliance on this court's holding in *Sanchez v. Simply Right, Inc.* is misplaced because the court noted in *dicta* that the outcome of the case may have been different if the court had evaluated the facts using the *Hall-Salinas* factors. *See* ECF# 70, p. 31. This hypothetical alternative reality is immaterial for the reasons discussed above – namely, that *Hall-Salinas* is no longer good law. Plaintiffs also contend that contract provisions which state that the Madeline Hotel would supervise employees[2] establish that the Hotel "contracted … to be a joint employer." *See* ECF# 70, p. 32-33. As Plaintiffs point out, however, "economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979). *See* ECF# 70, p. 33, n.10.

---

[2] These contract provisions appear to be lifted from another document without due consideration of their meaning, as they reference that the Client shall:

    a. Properly supervise assigned employees performing its work and be responsible for its business operations, products, services, and *intellectual property*;

    b. Properly supervise, control, and safeguard its premises, processes, or systems, and not permit Assigned Employees to operate any vehicle or mobile equipment, or entrust them with unattended premises, cash, checks, credit cards, *confidential or trade secret information*, negotiable instruments, or other valuables without MPCS prior written approval or as strictly required by the job description provided to MPCS.

ECF# 68-3, p. 7, 10-11 (emphasis added). Clearly, there is no concern regarding intellectual property, confidential business information, or trade secrets associated with performing housekeeping work.

As discussed in the Motion for Summary Judgment, the reality is that the Hotel's efforts to ensure that Mountain Premier and Santa Ana complied with their contractual obligations, including compliance with the Contractual Cleaning Standards, *relate to the Hotel ensuring that Mountain Premier and Santa Ana (by way of their workers) provided the services that they had contracted to provide.* As such, rather than resulting in effective control of the plaintiff's employment, the Hotel was ensuring compliance with the contracts. ECF# 68, p. 19 (quoting *Sanchez*, 2017 WL 2222601, at *13 ("Here, many of the alleged instances of control relate to Cinemark employees ensuring that Simply Right (by way of its workers) provided the services that it had contracted to provide. As such, rather than resulting in effective control of plaintiffs' employment, Cinemark was ensuring effective compliance with the [subcontract agreement].")).

Even if the second *Bonnette* factor were deemed to be a close call, the totality of circumstances warrant summary judgment in favor of the Hotel. As demonstrated above, the material undisputed facts show that three of the four *Bonnette* factors weigh firmly in support of the conclusion that the Madeline Hotel is not a joint employer. As in *Sanchez*, the type of control that the Madeline Hotel exercised to ensure that Mountain Premier, through its workers, met the Contractual Cleaning Standards "is not enough, at least not when faced by the countervailing force of the facts stacked against finding a joint employment relationship." *Sanchez*, 2017 WL 2222601, at *12.

w

**IV.     CONCLUSION**

For all these reasons, the Court should grant the Madeline Hotel's Motion for Summary

Judgment and find that the Hotel is not a joint employer.


Dated: June 24, 2024                        Respectfully submitted,

                                            BAKER & HOSTETLER LLP


                                            By:     _/s/ Courtney M. Witten_
                                                    Courtney M. Witten (42786)
                                                    cwitten@bakerlaw.com
                                                    Mark D. Temple (00794727)
                                                    mtemple@bakerlaw.com

                                                    1801 California Street
                                                    Suite 4400
                                                    Denver, CO 80202-2662
                                                    Telephone: 303.861.0600
                                                    Facsimile: 303.861.7805

                                            Attorneys for Defendant
                                            TELLURIDE RESORT PARTNERS, LLC
                                            d/b/a MADELINE HOTEL & RESIDENCES

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Courtney M. Witten*

Courtney M. Witten